Court, my name is Jim Dowd, and together with Russell Spivak, I represent the appellant I plan to focus on three questions with my time. First, I'd like to start by explaining how straightforward the combination of the modification in question is here and why the Board's decision on the motivation to make that modification was error. Second, to focus on the reasonable expectation of success in light of the very simple modification and how the Board erred as legal matter in its application of that standard. And finally, to address how the Frye reference anticipates claims one and three, and how the Board's analysis of the close to one limitation was error. In the blue brief at 37, you say that PTAB found facts that demonstrate that DiffSolar and Frye are directed to similar types of error correcting codes. And in the red brief at 28, Caltech says that PTAB didn't do that. What does similar types mean by your definition? Yes, Your Honor. So they're similar in a number of fundamental ways. And the first is they are both related to a specific type of error correction code called a turbo-like code. That type of code has a specific structure that is the same in both Frye and DiffSolar. It's a repeater followed by something called an interleaver that changes the order of bits, followed by a second coder which is a convolutional coder in both cases. And so I believe the findings are at A19 and A23 or 24, right around there. With respect to DiffSolar, what the Board found was that it describes these turbo-like codes that have this structure of a repeater followed by an accumulator separated by an interleaver. And then what the Board found, I believe it's either at A23 or 24, was that what Frye teaches is to modify that specific type of code, a turbo code, by making the repeater irregular. It's that one modification that we say produces everything in the claim. And we can see that because DiffSolar, for example, which is at, I believe, A8, 1050, shows exactly the same structure as the patent, 710 patent claim, sorry, figure 2, that embodiment. It's a repeater followed by an interleaver followed by an accumulator. If you make the single modification that Frye teaches to take the repeater and instead of repeating every bit, for example, five times, I'm going to make that modification, which is simple, yields exactly what's shown in the figure 2 embodiment and what is claimed in the claims of the 710 patent. Why aren't the reasons at page A27 of the appendix, which is the Board's opinion, there's a paragraph or two there where the Board provides its reasons for why it would not have been obvious to make that modification. Why aren't those reasons supported by substantial evidence? And I mean, they don't need a whole bunch of reasons, but if there's at least one reason that isn't, it is supported by substantial evidence, don't you lose? There are at least two or three reasons why, Your Honor. And the reasons really come down to the line of decisions that starts with nuvasive, which is cited in our brief. Yeah, but, okay, so look at page A27. I'm familiar with that. And in particular, it's the second full paragraph. And maybe right in light of the paragraph above that, it gives, I'm not, I don't walk away from this opinion not understanding the discernible path that the Board was presenting. And so explain to me, I mean, under nuvasive, it's only if you can't figure out a discernible path that there's a nuvasive problem, right? And then secondly, the question is whether there's substantial evidence to support these findings. Well, I think, I think it falls within nuvasive and it's actually quite close to the, I believe it's the Microsoft versus Parallel Networks case, which we cite as well, where you have expert testimony in the record from Drs. Frey and Drs. Davis in our case that lays out exactly the factors that we say give the motivation. One of which, for example, is this e-mail that is quite extraordinary because it is an e-mail from the author of one of the references, the Frey reference. You're not answering my question. I apologize. Why aren't the reasons provided here good enough? Why aren't they provided by, supported by substantial evidence? Because Because the patent owner argues that Frey acknowledges that finding good profile regularity is not trivial. We agree. Okay. Why isn't that supported by substantial evidence? Well, two, two reasons for that, Your Honor. First is, it just says the patent owner argues we agree. It doesn't explain why it rejects the four or five reasons that Apple had put forward for the motivation to combine. And in that response Frey regularity is not trivial. That's the one sentence that's provided there. There's a dispute about whether the finding a good profile for regularity is trivial or not trivial. And as I understand it, Frey has maybe 32 different combinations and only one of them would work here. Is that right? Well, that actually was not a finding below. So that is not correct. There's no finding of fact that anything in Frey wouldn't work. What Frey actually teaches repeatedly over and over and over again is that this is a small change to use Frey's words, a trivial change to use Frey's words, that results in improved performance. And there's no statement in Frey. Yeah. And you're saying the next thing, patent owner argues that Frey's profiles yielded only one functional result. Furthermore, petitioner fails to explain how an ordinary skilled artisan would have incorporated Frey's irregular repetition into DSLR. And so, Your Honor, there are really, I think, analytically a couple of different points here. The first is that with respect to the requirement to provide a good profile, which the Board imposed on us, there is no such requirement for a motivation to combine. And specifically, this, I think, relates to the reasonable expectation of success as well. The reasonable expectation of success only requires an expectation of succeeding in proving what was claimed would have been obvious. And there is no profile claimed in any of these claims, good or otherwise. That goes a little bit more to your reasonable expectation of success argument. It does, but it also, I think, goes to the motive as well. Because if we read this, all the Board is saying is, patent owner argues, we agree. And then it doesn't actually make a finding as to the next two sentences. Actually, I think the last sentence for sure is a finding, right? Petitioner fails to explain how an ordinarily skilled artisan would have incorporated Frey's irregular repetition into DSLR. How is that not a finding? But on that one, actually, that is explained. That actually is not supported by substantial evidence. Because in the petition, specifically in the petition at starting at, I believe it's A753 and it goes over through to 756, there is an example given there of if you started from repeat three, which is what DSLR, one of the examples of DSLR, and you modified that in light of Frey's teaching to have some bits repeated twice and others four times, that would give you everything that's claimed. That is a specific example in the petition that is supported by Dr. Davis's declaration. What were you just reading from? This is on pages 7053 through 7054. That's in the petition itself. That's supported by Dr. Davis's declaration. And then it's also supported by Dr. Frey's declaration and the simulations that he performed where he, again, this is something the board discounted. It did not give it any weight. Incorrectly, we would propose. Dr. Frey gives the example of starting from encoding using a simulator exactly what DSLR teaches. And he confirmed that it was exactly what DSLR teaches by reproducing the exact results that Frey got in one of his DSLR figures. So he started from exactly what DSLR teaches. And he said, okay, I'm going to take the teaching of Frey, which was to make some bits repeated a different number of times than others. So he started where everything's repeated five times. And he said, okay, I'm going to change that based on Frey's teaching alone, and that's all I'm looking at. And I'm going to make it some repeated three, others repeated seven. And that, with one change, which took him, he said, 30 minutes to do, yielded exactly what's claimed and also yielded the improved performance that the board was requiring us to show, even though that wasn't required because the claims don't require any improved performance. So it's a simple modification. It's the, getting back to Your Honor's question, we think it is exactly within the Nuvasiv case, the Parallel case, the Microsoft versus Parallel Networks, the Emerson case, because the board first did not actually address, for example, the 1999 e-mail between the authors of these two references suggesting this combination when it was deciding whether or not there's a motivation here. It was, we would say, very clearly in error to say in the footnote where it says this. And that would be, you would argue, an abuse of discretion on failure to consider that evidence. I believe so, Your Honor. But it's also just simply wrong because there were multiple declarations from Dr. Fry corroborating the e-mail itself. Is this also where the board disregarded the simulation or is that any other idea? That is, that applies, we think, that is a separate argument, but it applies as well. So in the, in the first instance, with respect to the 1999 e-mail, that's an e-mail from Dr. Fry to Dr. Divsilar that says we should combine our references, in effect. It says What does it say, combine our references? What it does is it says, let's Say, I like your work, maybe we should try to continue it. It says, have you read my It's a pretty wide range of work, right? It says, have you read my paper? We should apply my paper's teaching to the work that you and your co-author on the Divsilar reference have been doing. And in Dr. Fry's declaration explaining that, he actually explains the two conferences where these were presented. One was in 1998 at a conference called Allerton, where he attended and Dr. Bob McLeese, who's the co-author on Divsilar, presented the Divsilar paper. And then he also explains that he presented it, the 1999 version of the same conference, and that Dr. McLeese attended his presentation of that Fry paper. And so you see that these two things are pointing to each other, and that there is a motivation to combine based on that email. And we would suggest that's pretty extraordinary evidence for the board to just not consider at all, when the basis for not considering it is the mistaken belief that there was no testimony from Fry to corroborate the authenticity of the email, when in fact there were two declarations that did exactly that. And what we have here at the end then on the motivation is, there were multiple reasons why there was a motivation, including both references are from the same field, both references describe turbo codes, both have the same structure. Fry teaches in Figure 1 specifically making the modification that we propose would be obvious, which is to take a regular repetition and make it irregular. Fry teaches that doing so will result in performance. This is also key. Performance that is as good as the Richardson or Bankey 1999 paper, that was the best performing code in the world at that time. And what Fry is saying is that if you make this what he calls tweak or small change. Can I ask you something about that email? Is it true that in the 219 IPR that the Fry DivSolar email was actually considered and it was found not to be persuasive? I would say two things on that, Your Honor. So first is the 219 was about the combination of DivSolar with a different reference called Luby. It was with Luby, but it also relied on Fry as motivation to combine DivSolar with Luby. So Fry was in the mix, right? But it's a different combination of different references. And so we would say it doesn't squarely apply. And then the second is in the passage I believe Your Honor is pointing to what the board I believe said was it doesn't teach a specific implementation of irregularity. So it didn't have a specific irregular profile. That is similar. We think that's the same error as requiring a good profile or improved performance because it doesn't actually, none of the claims require a specific irregular, actually the wording is, and this is A56, a particular irregular code. It doesn't, these claims don't require a particular irregular code. They just require irregularity, which is what would have been obvious based on Fry. And with that, unless there are other questions, I do want to reserve a bit of time. You've got it. Thank you. We ate up a little bit of yours. I'll give you two minutes on it. Thank you, Your Honor. Respond. Thank you, and may it please the court. If I may, absent immediate questions, I'd like to turn to the issue of reviewability that was brought up. And as Your Honor pointed out, the key analysis here is whether the board's path can be taken to reviewability and I'm concerned here, and it clearly can, and that's laid out in the board's decisions. And it's important to note what was offered as the stated motivation. Can I push back on that a little bit, what you said? I mean, what about, I mean, a lot of this discussion is petitioner argues this, patent owner argues that, and even in the paragraph that I cited to, which I think is probably the best place for where the board actually makes its own findings, there's a sentence in the middle of it where in order to support their finding, they say, indeed, patent owner argues. They're not even adopting the patent owner's argument, or maybe they are, I can't tell. So how do you respond to that? Again, that's on page A27, and this is with respect to the first IPR, the 210. Sure. I think there are several areas. They do do a lot of that. They identify the arguments and state which ones they find persuasive. There are other areas that I think are a little bit more clear as findings of fact. But what is clear, and this is stated at A26 and A27, is that the argument that was being advanced by Apple was that this notion that modifying DivSolar would have been a trivial thing to do, and it would have resulted in improved performance. This is stated on A26. There, the board is representing what petitioner argued right in the middle of the page there. They're saying petitioner argues that Fry's teaching of better performance, and then goes on to represent their argument about it being a trivial modification. We point this out in the red brief that the petition materials are littered with this type of commentary, that it was improved performance and a simple, trivial modification. That's integral to their argument. So the board's identifying what their argument was, identifying the responsive argument, saying they agree with it, and going through and highlighting some things. And one of the things that they highlight is the Fry reference itself as supporting patent owner's argument and Dr. Mitzenmacher's testimony that this was not a trivial modification. So that's the only thing where they say, they say, patent owner argues Fry acknowledges that finding a good profile for regularity is not trivial. We agree. It's the only thing they say they agree with. Well, and there they're citing right to the Fry reference, which above they're identifying on page 27 there, they're identifying patent owner's response, the key argument there, and saying they agree with it, and then going through and highlighting some things. One of the things they're highlighting that Your Honor points to is the statement in the Fry reference itself, which is describing the modifications using the term not trivial. So it's striking that the petitioner, Apple, is arguing you would have done this because it would have been simple and trivial, and they're pointing to a reference that actually states explicitly this was really hard. This was not trivial. So it was a key piece of information given the argument that was advanced. There are other aspects, Your Honor. The very next paragraph, this is something we point out in our briefing, the red brief as well. One of the key pieces of evidence that Apple relied on to support this argument and notion that this all would have been simple and trivial was they went to this Kandekar thesis. Dr. Kandekar is one of the co-inventors. They submitted his thesis that came out after the filing date and tried to use that as support for this argument that it would have been very trivial based on figures he was presenting. They do have a lot of rationale here for why they didn't find Kandekar persuasive, but that was surely not Apple's only argument. That was not Apple's only argument. Their primary argument was the trivial modification, and the Kandekar was key to that. The Board does go on. I would turn to A-28, and this gets to the notion of the improved modification that was being argued. There are several instances where the Board is saying, we looked at the evidence and we agree with Pat Noehner that Frye is not teaching improved performance. It's testing actually illustrates degraded performance, so there's another... This is, though, on page 28, they've moved on and they're talking about reasonable expectation of success, right? I don't think so, Your Honor. I think right there, actually, they do mention reasonable expectation. I think they're talking about the two things together. I think they're talking about motivation with a reasonable expectation rather than bifurcating that. Where do you see them mentioning motivation here? Well, here, the first paragraph says, vague and unsupported statements regarding the combination and the proposed modification. They specifically mention reasonable expectation. So I would say there it's a little bit more specific to reasonable expectation. And the next paragraph also talks about failing to establish reasonable expectation. It does, Your Honor. And then at A30, they sort of loop this all back together and say, this is all part of our analysis under Graham. We are tasked with evaluating this in view of the state of the art, ascertaining the scope and content, as we're supposed to do in view of Graham, KSR, and many decisions from this court. What in your view... It's sort of a two-part question. What in your view is the success that must be reasonably expected? And second, what do you think the board's understanding is of a success that must be reasonably expected? I would absolutely take issue with this notion, or the argument that was advanced, that the board was requiring improved performance. It absolutely was not. What the board was doing, and what I would say is a measure of success. In a case where you have a moving party with a heavy burden of proof, that there must be some argument about it. So that was one of the key problems in this case, is there really was very little argument about what the reasonable expectation was. Suppose, at least in one possible understanding, Apple's position is, if you could make the code, that is success. And so the only argument on that view that they would need to make is, we could make the code. Not we, but the artisan at the priority date could make the code. Wouldn't have been a problem. And what is that code? It can't be used to decode if it doesn't decode anything. What is the success that, in your view, must be reasonably expected? It has to be able to function as a code. What do you mean by function as a code? That's a good question. Can it properly decode with a sufficient number, or a sufficient level? Oh, error, right. Yeah, and there is objective measures in the art that are pointed out and just explained by Dr. Mitzenmacher with supporting evidence about... No flatlining or whatever that's called. About sort of what folks in the art viewed as a generally acceptable error threshold. Right? If the objective is to decode your signal, you can tolerate some errors, but there are levels of errors that are intolerable. And when you get a code that no matter how high you crank up that signal to noise... Are you saying that on the assumption that some degree of, some functionality as understood within the coding industry is required, which is more than we can just make a code, their proof failed because they didn't have any proof above the threshold of we could make the code? I think that's true. I would also caveat what I believe the board did was to weigh the evidence about the high degree of complexity and unpredictability in the art and state that that type of state of the art weighs in favor of non-obviousness. They also then went on to make findings as to why they were rejecting the argument that was being advanced, trying to turn these facts around and say, well, okay, but if there's a high degree, and this is a creative argument, I'll give Apple credit for this. It just doesn't work. And that argument was, well, if it's highly unpredictable and lots of experimentation is required, that means experimentation becomes routine, which, you know, sort of turns the whole analysis around, and I would respectfully submit it doesn't really make sense or comport with the legal requirements. Going back to reasonable expectation of success and your view of what's required, do you think your view is consistent with cases like intelligent bio-systems that say you're just supposed to have a reasonable expectation of success in meeting the claim limitations, not some standard beyond what's expressed in the claim? I agree with that, and I would say it's consistent with intelligent bio-systems for two reasons. One of the other notable aspects of that decision is the emphasis on the responsibility of the moving party to actually state their case and lay it out with some degree of particularity. That was a very important part of that case, absent the reasonable expectation. So that's a problem here. There was no reasonable expectation argument in the petition. There was no identification of the state of the art, which everyone later agreed was a highly complicated and highly unpredictable state of the art. Did you agree also that your claim doesn't have, like, a measure of success in it expressly, right? Well, to answer your question, I would agree with the intelligent bio-systems case that a party can't invent a requirement and then tailor expectation to that requirement that's not embedded in the claim. I would say that doesn't present here when we're talking about error correction codes, which we ask, what does that mean for something to be an error correction code? At a minimum, you'd have to look at what the art accepts as a suitable threshold, and what we've identified in evidence, what Dr. Mitzmacher explained and what he substantiated with evidence, is there is this general threshold that people recognize. And also, people recognize that if you tested codes, they ran into these error floors, you discarded them. In the previous case, we talked a lot about a Mackay reference. Where in your claim am I supposed to see error correction code? Excuse me? Where in your claim am I supposed to see error correction code? Well, it's a method. It's a pretty broad thing. I believe they're a method of encoding signal, opening a coding system. And in the context of the patent, this is very much talking about error correction codes. So I should read that in from the spec? Well, I don't think you need to do that. I mean, I want to be really clear. I think this is a false narrative that the board set this standard of requiring improved performance. I would very much push back on that. I think what the board did was credit the state-of-the-art at the time, and note correctly that a highly unpredictable state-of-the-art, that tends to weigh in favor of non-obviousness. And then they came back and noted, petitioner hasn't given us anything else to push back on that. So when we're talking about reasonable expectation, there was no argument about reasonable expectation in the petition materials. Let me point to the specific reference. In A31, the board says, in the absence of evidence rooted in the petition that substantiates why you would be doing this thing and expecting a positive outcome, just reliance on the no need for experimentation isn't sufficient to support an obviousness rationale. You agree in a lot of electrical-type inventions, though, this reasonable expectation of success doesn't even come up, right? I would agree in the predictable arts it's less important. I would also say that there's agreement between the parties. This is not the predictable arts. This is a highly unpredictable field, which is probably why it sort of caught them off guard as petitioners. You look at this and you think electrical engineering, this is generally predictable arts. But as you get into talking with the experts, including their own expert, who testified that it's mathematically impossible to predict these things in advance, we came to understand in the course of a developing trial, this is a very highly unpredictable area. So it's not surprising. Something I want to make sure I get you able to address for me, which is in the 219 IPR, where do you think is the best place for me to understand what the board had to say about motivation to combine? Because, again, much of the discussion is focusing on petitioner argues this, patent owner argues that, and then there's a lot of discussion about reasonable expectation of success. But I don't really see a clear path on motivation. Can you tell me what you think the best place is for me to look at? Yes, I would say there are a few things there that add on top of. . . I think it might be beneficial for you to point out to me, if you can, where that is. Sure. So the Kandikar thesis is at 852, discussion of Frye. . . The Kandikar thesis, but the trivial, the finding that this is not trivial, and that therefore, because it's not trivial, the underlying basis for combining Luby with Steve Szilard is missing. Yes, so further down on 852, after they dispensed with the Kandikar argument, that was, again, was a, you know, I know Apple would like to dismiss this, but that was a critical part of their argument. But then it goes on to talk about Frye in more detail, and it's crediting the argument in evidence that despite the representations that Frye would motivate a person to include these modifications for the purpose of improving performance, that's not what the Frye reference reported. And it goes in . . . What about, there was an argument by Apple, and I think that it's acknowledged on page 51, that Apple relied on Luby itself for a suggestion that he would want to modify Steve Szilard in view of Luby, because Luby says it would be . . . I don't know what this is. There was some adjective that suggested . . . And that's . . . So just Luby standalone is a motivation to come back. Okay, this is an important part, and I appreciate you drawing attention to that. There are two things about Luby. One, their initial petition just flatly misapprehended the reference. They pointed to Luby as teaching a regular repetition of information bets, and what was explained and developed during trial is that reference doesn't . . . which is an entirely different concept. It was explained by Dr. Mitzenmacher, one of the authors. Is it 6620 in the . . . Yes. In the appendix. Yep, it's explained throughout in his deposition, and it's all over the record, to the point where Apple really backed away from that, and they sort of went to this In Ray Latham type pivot, where they're initially relying on reference for teaching something, and then they sort of retreat from that and say, well, okay, but it could have taught that. And it starts to get in . . . to pivot to this Frye reference in place. But that was an important aspect of that case. You're going to need to wrap up briefly. Yeah. Can I just mention one thing really quickly, if I may, Your Honor? And that's this idea that the board disregarded the email. I would contest that representation. I think the body of . . . There's a footnote in one of the decisions, but . . . Yeah, that it wasn't authenticated or proved to be hearsay. We would concede for purposes of appeal that it was authenticated. It's not hearsay. That's a footnote where they say that in the body of the board's decision in both cases. The footnote only appears in one case. In the body of the footnote, the board does go through and explain . . . Footnote 7. Correct, Your Honor. Footnote 7. What does the body of the text say about why the email doesn't do what Apple wants it to do based on the assumption it has been authenticated? Yes. It says two things. One, it's addressing this argument that Apple advanced that no need for experimentation would provide a motivation and expectation that you would conduct such experimentation and arrive at a result. And the board pushed back and said, essentially, this is at best an invitation to experiment. And even a recognized need for experimentation . . . This is at A30. . . . does not establish what that particular experimentation would be or why you would expect it to produce a successful result. And then goes through and cites some of the cases that support the notion that unpredictability and the need for experimentation actually is a factor that weighs in favor of non-obviousness. And they say that in both. Thank you so much, Your Honor. Is there a fact-finding anywhere in the board's opinion on whether Luby, in fact, teaches irregular codes as required by the claims? I don't believe the board found one way or the other on that. Was it disputed? Well, the argument that was made based on Luby, specifically in the 210, was that there was a distinct trend in this industry which helps supply motivation. And I'm looking here at Appendix 7057, that the benefits of adding irregularity to regular codes had been demonstrated by a number of different researchers in the field. But it's not disputed any longer that the irregularity that Luby used was not irregularity on the encoding side as to the information? Well, it is actually in Luby. It is irregularity in the encoding as well. I believe so, Your Honor. But the point is, though... As to the information bits? How often, how many times you, how much you have each information bit contribute to the code word? Yes, Your Honor, because in Luby, what Luby is talking about is irregularity of the code word where the code word is comprised of both parity bits and systematic bits, which would be information bits in the language of the client. I thought Mitzenmacher explained that the irregularity in Luby was about what was happening on the post-input. No. In Luby 97, there's discussion of irregularity on the encoding side as well. And then in Luby 98, there's discussion about why that encoding produces a good result. There was, I think, in the language of Luby 98, the intuition of the authors about why it produces a good result. But the key point that I would want to bring Your Honors to is that what we have here is a trend. I think 6620 is devastating to that argument. That page, I think, to which Judge Toronto was referring. And I think just, I don't wish to sidestep this, but with limited time, the point that I'm making is that, with respect to the combination of Frye with Ivselar, what the Luby references do is to teach people, or to demonstrate that there is, in this art, a trend toward adding irregularity. And in Luby, it's in an LDPC code, in Luby 97, then Luby 98, and then Richardson or Bankey in 99. And these are all cited at 7057. And then Frye itself, which says, I read Luby, and I applied the irregularity to the repeater. And then that repetition, the irregularity of the repetition, in Frye is what would, we say, have resulted in the combination with Ivselar, because those two are so closely aligned. Are we now back on the 210 proceeding? I am, Your Honor, and I would focus on the 210 for this. Okay. And the point that I'm making is that it's a clear trend in this industry to add irregularity, leading up to Frye, which does it at the specific point that matters for these claims. And it's that Frye disclosure that makes it obvious when combined with Ivselar. So it's not Luby alone. It's Luby as supported by Frye. And that's how you view it? I would view the combination as Ivselar is the base reference. Yeah, got it. Frye teaches you to make Ivselar's repeater irregular. Got it. And that's against the backdrop in this industry of years of teams from different places. So that's even for the 219 IPR? I just want to make sure I understand what your position is. That's specifically for the 210 IPR, and I'm referring to the petition in the 210 here. For the 219, I think the combination is just the generalized teaching of Luby's irregularity would have motivated somebody to introduce irregularity in Ivselar. But I would focus, Your Honors, on the combination of Ivselar and Frye. What about the argument that you were pivoting in response to the disclosure on page 86620? Thank you for that, because I think that goes to this issue about experimentation. And we were not pivoting on experimentation at all. I think the argument that you just heard and part of the error with the board below is on what this experimentation really is. Our position has been and always was... You need to wrap up, counsel. You're well over. I gave you extra time. I'll just finish this answer, and then I will stand down. Our position below is and was, and this is in Frye itself, that to achieve the good results that Frye reports, where he shows a coding gain that is close to the best known codes in the world, the reference 3 to Richardson, is done based on just a simple tweak or small change. And what he then says is, we get those results from the simple change, the small change. We could go on and try to optimize to find a good profile. And that, the optimization, could get difficult, could get beyond the trivial. But by that point, you're beyond the claim, because the claim doesn't require me to get all the way to the optimized code, the best performing code, the best version of an irregular profile. The claim covers every profile there is with irregularity. And so... That was your last sentence. I think you have the point. Thank you, Your Honor. I appreciate the time.